## City of Paducah v. Brunnhoper.

Dec. 13, 1939.

178

Adrian H. Terrell for appellant.

Jack E. Fisher and Caswell B. Crossland for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

Mrs. Brunnhoper sued the city of Paducah, Kentucky, to recover damages for personal injuries sustained as the result of a sidewalk accident, wherein she stumbled and fell, painfully injuring and fracturing her foot and ankle.

From a verdict and judgment recovered by her for

$5,000, the city has appealed, earnestly insisting, as grounds for reversal of the judgment, that the following errors, prejudicial to its substantial rights, were committed upon the trial:

(1) The court erred in refusing to sustain defendant's motion for a peremptory instruction offered at the close of plaintiff's testimony and renewed at the close of all the testimony.

(2) The damages awarded in the sum of $5,000 are excessive and not warranted, and evidently brought about through the passion and prejudice of the jury trying the case.

(3) The court erred in its instruction to the jury to find damages for the plaintiff on account of permanent injuries, there being no definite and positive proof that she received permanent injuries of any kind.

The accident occurred in the following way:

At about nine o'clock on the evening of June 16, 1938, Mrs. Brunnhoper, with two friends, Mr. Proctor and Mrs. McCann, was walking along the west sidewalk of Second Street, between Kentucky Avenue and Broadway. It appears that Mr. Proctor walked between them, Mrs. McCann next the curb, while the plaintiff walked on the inside of the sidewalk, next the buildings. Mrs. Brunnhoper, when passing Cazner's clothing store, stumbled and fell upon a runway platform or ramp, which it appears he, with the city's knowledge and permission, had placed at his store door step for convenience in trucking freight into and out of the store.

This platform or ramp, it is admitted, was installed by Cazner shortly after the 1937 flood and has since such time been maintained and left outside the doorway by Cazner both day and night.

It was constructed even with the top of the door step, from which it sloped down to the sidewalk, a distance of some two or two and a half feet, and extended towards the curbing, flush with the sidewalk, a further three feet.

The evidence shows that upon this occasion the part of Second Street where the accident occurred was very dark, there being neither a street nor a store light there to disclose or warn travellers along the sidewalk of the location of this alleged dangerous platform ob-

struction; and that the obstruction was not seen nor discovered by Mrs. Brunnhoper, when she stumbled and fell over it onto the concrete walk, thereby receiving the painful and severe injuries to her foot and ankle complained of.

The testimony of plaintiff and her witnesses, among whom are her two companions, shows that so severe was the injury and pain resulting from this fall, fracturing her ankle, that she had to be lifted from the sidewalk and assisted or practically carried to a nearby car, where she rested for awhile on its fender, after which she was driven to Redmon's place nearby, into which she was again practically carried by her companions. She states that after there drinking a coca cola and taking an aspirin, she was taken home in a taxicab by her companions, who carried her into the house and put her to bed.

She called Dr. Bradley to treat her injury, who testified, after qualifying as an expert, that he found, upon examining her injured foot and ankle, that "she had one of the bones broken in her leg and dislocated and a strained ankle, a strained foot" and that he had attended her "ever since about the 18th or 20th of June." He stated that plaintiff "has a stiff foot" and that "she cannot get her heel down to the floor. The ankle and foot is in perfect position, but it is just stiff, like you would have a stiff knee or a stiff elbow. The inflammation was of such a nature this gluey substance cemented the bones together and she cannot work it;" that it had been nearly six months since she had received the injury and there has been little improvement; and that he didn't believe she would ever have a good foot. When asked upon cross-examination if there was any way to break up the adhesions that caused plaintiff's foot and ankle to be stiff, he answered,

"The foot has many little bones and I don't believe those can ever be broken up."

Further, he testified, when asked if he had said she would probably be permanently injured in her foot, that he had said he believed she would be crippled permanently; that no man could say that she would be a cripple; but that he believed, at her age, she would have a stiff (ankle) joint.

Dr. R. C. Gore, also testifying for plaintiff as an expert, stated that he had examined Mrs. Brunnhoper's

foot and that she now has an ankylosed condition and that evidently she had a fracture and a dislocation of the bone. Further his testimony is that:

"The position seems to be perfect, but she cannot work the bone. In other words, her foot has dropped down slightly, she cannot put her heel to the floor, and I am satisfied there has developed an arthritis, and that is the complication she has now. That as a rule when you get this type of an injury, it results in a permanent injury. You can hardly move it enough to overcome this ankylosed condition. A callus is thrown out and you cannot get motion down there, and if you do, you get arthritis, especially if a person is past 25 or 30 years of age."

When asked on cross-examination if he meant that there were adhesions, which would have to be broken up before plaintiff could use her foot, he answered "Yes" and that it is very painful to break them up; when further asked if he had said that in the majority of cases where people have a fractured bone they overcome that condition by proper exercise, he answered:

"In a majority of cases, but these types of cases have to be handled very carefully, and as a rule they are left crippled."

He further testified that while he had not made an X-ray of the foot, Dr. Bradley had, the showing of which he was told when in consultation with him, and that he was satisfied there was a fracture of the bone; that in this case it was the small bone of the ankle, or fibula, which was broken, which does not amount to much, but that it was the dislocation that hurt and "this callus that is thrown out;" and that there was a fracture and a dislocation.

Defendant, on the other hand, contends that plaintiff and her friends were upon this occasion drinking and acting in a hilarious manner and that plaintiff was not at the time of her fall and resulting injury exercising ordinary care for her own safety.

There was some proof that the plaintiff and her companions appeared to be drinking at this time, though other of the defendant's witnesses stated that Mrs. Brunnhoper and her companions were walking along the street, talking and behaving naturally, and that

their manner did not indicate that they had been drinking.

However, Mrs. Grace Henry, defendant's witness, testified that she saw the parties walking along, talking and laughing together; that when she met them they were coming up the steps at "Poor Boy's" place; that there were a lot of drunks there and they acted like they were too.

Defendant's witness, Ruth Jones, testified that she was sitting on the street curbing at the time this accident occurred; that she heard a commotion up the street and saw that plaintiff was in the street, but that she didn't know how she came to fall or anything about it. When witness was asked if she had noticed the manner in which Mrs. Brunnhoper and her friends were walking as they passed her, she answered that she never paid any attention; that there were a number of drunks down there and she never paid much attention to anybody; and that plaintiff never said anything about the accident, only that she didn't want anybody to know that she was down on Second Street.

Defendant's witness, Mr. Durrett, testified that he had been for some ten years and was then in the grocery business at 119 South Second Street, next door to Cazner's store; that he had seen this platform or runway located in front of the store the day this accident occurred and described it as "just a little wooden runway that come up to the door, about six inches high, and it run back about 24 or 25 inches to the sidewalk to a feather edge. It was about six feet long, just a wooden runway;" that it had a smooth surface; that he thought Mr. Cazner had the runway built; that the platform stayed at the door night and day.

Also, Kelley Franklin, a police officer of the city, stated that he was acquainted with plaintiff and that prior to June 16, 1938, the day of the accident, he had occasion to see an injury or condition affecting her left leg; that on May 4, 1938, she was in his office and then had a swollen ankle, with adhesive tape around it; that she had told him she had gotten injured in a taxicab, but that he could not say that plaintiff did not fall on Second Street and break her ankle, as he knew nothing about it.

Dr. Linn testified as an expert for the defendant that he had made an examination of Mrs. Brunnhoper's

injury complained of at the direction of the court and had taken her to the hospital, where he had plaintiff's ankle and foot X-rayed; that plaintiff at the time had given him the history of the case; that she had fallen and injured her ankle, four days later she had had Dr. Bradley and that Dr. Bradley had sent her to Dr. Reed, who had an X-ray made, and that she was totally disabled for quite awhile and was then partially disabled. He testified that he made as careful an examination of the foot as he could, of the measurement and the use of it, etc., and that there is no difference in the measurement of the two ankles, the left and the right; that he measured with a tape both at the instep and the ankle, and then measured around it and there is a small difference of ¼ of an inch in the injured ankle and the right ankle; that the X-ray taken of her foot and ankle showed a fracture of the fibula and that such fracture is not classed as severe; that the X-ray he had made showed a perfect alignment of the bone; that in examining plaintiff, he placed her leg on a chair and her foot was free and she can move her ankle; that it is not ankylosed or stiff, but that she cannot put her heel down to the floor without pain; that a broken bone around a joint, when it is kept still for a long time, gets stiff and this stiffness and soreness has to be worked out before the leg can be used without pain, and that in his opinion, there was no reason why the condition complained of by plaintiff could not be overcome by proper exercise and that the disability plaintiff is now suffering is not permanent.

A few weeks following the plaintiff's accident, she filed this suit, seeking recovery of damages for her foot and ankle injury and breaking sustained in this fall, and resulting permanent injury, wherein she alleged the facts and circumstances thereof substantially as stated supra.

Defendant filed answer, consisting first of a traverse of the material allegations of the petition and second of a plea of contributory negligence, when by agreement of parties, an order was entered controverting of record all affirmative matter of the answer and the reply filed thereto, which made up the issues upon which the case was tried.

The plaintiff's cause of action against the city appears predicated upon the allegations of her petition

that the city and its agents, having supervision of its public ways and charged with the duty of keeping them safe for public use, were negligent in permitting this runway platform to be maintained by Cazner in front of his store for a period of more than two years, during which it had knowledge of the dangerous obstruction it made on this much used street both day and night and knew that from the condition thereby created it might reasonably anticipate that accidents and injury might befall the pedestrians using this public way or sidewalk, especially during the nighttime, when shrouded in darkness and no warning or notice given pedestrians of this dangerous obstruction.

It is to be noted that plaintiff in her petition alleged,

"that while she was going from Kentucky Avenue to Broadway * * * and going north on the pavement on the west side of Second Street, and in front of the store of Ruby Cazner, and at a place where she had a right to be, and where it was so dark that she could not see the dangerous place and obstruction on the pavement where said platform had been placed and allowed to remain by said city, so as to create a dangerous place on said pavement to the public traveling over same, she without fault or negligence and while exercising ordinary care for her own safety stepped against and onto said platform and obstruction which caused her to fall violently upon said pavement, whereby she sustained serious, painful and permanent injuries; that the outer bone of her foot and ankle were broken and fractured, and whereby she was caused to suffer great mental anguish and physical pain and suffering and whereby she received lasting and permanent injuries and has made and left her a permanent cripple for life."

Defendant, as stated supra, answered, traversing these material allegations of the petition and further pleaded plaintiff's contributory negligence, as having been the proximate cause of her accident.

We have set out at some length the testimony adduced upon the trial, because of the character and nature of the grounds assigned by the city for reversal of the judgment.

The first of these grounds is that the court erred

in overruling defendant's motion for peremptory instructions.

It is patent that there is no merit in this contention, since the court was authorized to take from the jury the determination of this question of fact made by the proof only where, though conceding, for the purpose of testing the propriety of the motion, the truth of plaintiff's evidence and all reasonable inferences therefrom, it is yet found insufficient, by the reason of its lack of substance and probative value, to raise an issue of fact, calling for its decision by the jury.

It is obvious from the summary given supra of the evidence that there was here no lack of evidence of probative and substantial character, conducive to show both that plaintiff's injuries were the direct result of her fall over the runway obstruction upon the sidewalk, wrongfully permitted by the city, and that same was not due to any failure to exercise ordinary care for her own safety. Conceding, as we may, that the defendant city is not an insurer of those using the streets or responsible for the stumbling and falling of pedestrians where the streets are maintained in a reasonably safe condition, it is yet obvious that the evidence here adduced was ample to show that this sidewalk was not maintained in such condition. Clearly, plaintiff's pleadings and proof stated and substantially tended to support her cause of action alleged. Wherefore, we must needs conclude that the appellant's contention, that the court erred in overruling its motions for a peremptory instruction, is without merit.

A further objection urged is that "the court erred in its instruction to the jury to find damages for the plaintiff on account of permanent injuries, there being no definite and positive proof that she received permanent injuries of any kind."

This criticism of the instruction we conceive is also unwarranted, in that no instruction was given directing the jury to specifically find damages for plaintiff on account of permanent injuries, but, on the other hand, the court only instructed the jury as to the measure of damages to be applied in awarding compensatory damages by its instruction No. 5, wherein the jury was told that if it found for the plaintiff, it would award her such sum in damages as it believed from the evidence would fairly and reasonably compensate her for physi-

cal pain and mental suffering, if any of either, that she had already suffered or which appeared reasonably certain she would suffer as the direct and proximate result of her injury, not exceeding $10,000; and such further sum as it believed from the evidence reasonably represented time lost as the direct and proximate result of the injury and doctors' bills, not to exceed $100 for each of the last two items.

In 15 Am. Jur. section 369, page 807, it is said:

"The usual rules as to the form and sufficiency of instructions apply to instructions in regard to damages.

"Instructions regarding the elements and measure of damages should be so drawn as not to invade the province of the jury in this regard, and should be confined to matters of damages in issue by virtue of the pleadings and evidence in the case. * * * The trial court should not, by its instructions, submit questions of damages based on a theory not supported by any evidence, or submit elements of damage which are not supported by any evidence or are not recoverable under the pleadings or otherwise. * * *

"Instructions as to the measure of damages should limit the jury to the damages shown by the evidence."

The instruction as given we conceive properly submitted to the jury the law by which it was to be controlled in making such an award of damages upon the evidence as would reasonably compensate plaintiff for her injuries, including that of permanent injury. Clearly, the jury, as instructed, was entitled to decide what was the extent of plaintiff's injury and whether or not it would accept the expert testimony of plaintiff's witnesses, to the effect that she was permanently disabled rather than only suffering a temporary disability as the result of her accident.

Clearly there was ample evidence adduced by the plaintiff to support the jury's finding that she was permanently disabled, giving it the right to award her damages therefor in such sum and amount as it thought would fairly compensate her, not to exceed $10,200. Therefore, we find ourselves unable to concur with this contention urged by appellant.

The final objection upon which appellant relies for reversal of the judgment is that the damages awarded plaintiff in the sum of $5,000 are excessive and not warranted and evidently brought about through the passion and prejudice of the jury trying the case.

As stated supra, this verdict, so finding for the plaintiff, was found as representing in its judgment and belief the amount of compensatory damages, including special damages, suffered by plaintiff as the result of her fall. The question therefore raised by this objection is whether the verdict is excessive as being for compensatory damages alone.

This same question was raised and the rule applicable thereto clearly stated in Nussbaum v. Caskey, 235 Ky. 640, 32 S. W. (2d) 18, as follows:

"The rule is that the verdict of a properly instructed jury will not be set aside as excessive unless the amount of damages awarded is so great as to strike the mind at first blush as having been superinduced by passion and prejudice. Consolidated Coach Corporation v. Hopkins, 228 Ky. 184, 14 S. W. (2d) 768; Fullenwider v. Brawner, 224 Ky. 274, 6 S. W. (2d) 264. In this instance the plaintiff sustained a serious and painful wound and necessarily suffered some shock and inconvenience. The measure of damage, as defined by law, includes compensation for the physical pain and mental agony produced by the injury. The extent and effect of the suffering could be determined best by a jury. There is no rigid rule or mathematical measure for the formation of a judgment upon such a question, and the whole subject, at last, must be left to the sound judgment and informed discretion of a jury of practical men. Broadway Coal Mining Company v. Robinson, 150 Ky. 707, 150 S. W. 1000. * * *

"By reason of the variable standard and the necessities of the case, our power to reverse an award of damages for pain and suffering wrongfully inflicted is limited to instances where the amount allowed is so disproportionate to any reasonable consideration of the actual injury that it strikes us at first blush as a passionate, and not a deliberative, judgment of the jury. City of Providence v. Young, 227 Ky. 690, 13 S. W. (2d) 1022;

Chambers v. Hawkins, 233 Ky. 211, 25 S. W. (2d) 363; cf. W. T. Grant Company v. Taylor, 223 Ky. 812, 4 S. W. (2d) 741.

"We are unable to say, in this case, that the damages allowed were excessive within the meaning of the rule by which we are governed."

Also, in City of Paducah v. Konkle, 236 Ky. 582, 33 S. W. (2d) 608, 609, the appellee Fred Konkle, a young boy, recovered judgment for $5,000 against the city of Paducah for injuries sustained by him when the pony he was riding fell with and on him, because, as he contended, of a defect in the street. There it is argued that the award of damages was excessive, even though the boy by the fall of his pony had his leg broken about midway between the knee and hip and both bones above the ankle obliquely broken, as the result of which the boy's leg, it was shown, would be about an inch shorter than the other one.

In answering the contention made that the damages awarded by the jury were excessive, the court said:

"The courts endeavor to define the measure of damages with some precision, but the application of the rule or definition must be left to the jury. Those twelve men, chosen with care as being fair and competent, are regarded as qualified to estimate the amount of compensation, and under the law their finding is to be accepted. It is only where the amount awarded appears to the judicial mind at first blush or impression to be so extravagant as to have been superinduced by passion or prejudice that it will be considered as excessive. In the recent case of Nussbaum v. Caskey, 235 Ky. 640, 32 S. W. (2d) 18, the attitude of the court towards the verdict of a jury in this respect is fully stated and the reasons therefor clearly given. The amount of this verdict, though liberal, cannot be regarded as excessive as thus considered."

See, also, to like effect Rose v. Edmonds, 271 Ky. 36, 111 S. W. (2d) 427; Hoagland v. Dolan, 259 Ky. 1, 81 S. W. (2d) 869; City of Pineville v. Lawson, 225 Ky. 542, 9 S. W. (2d) 517; Jefferson Dry Goods Company v. Dale, 257 Ky. 501, 78 S. W. (2d) 305.

As said in Alsbrook v. Commonwealth, 243 Ky. 814, 50 S. W. (2d) 22, 24:

"The court is not authorized to rejudge the justice of the verdict of a jury. In the absence of some error of law, or failure of the proof, a new trial cannot be ordered. The jury is the tribunal established by law to determine the quality of conduct, the credibility of witnesses, and the probative value of testimony. The result of a trial by jury, derived from the consideration of conflicting evidence, under proper instructions, must be accepted here. Brown v. Commonwealth, 226 Ky. 255, 10 S. W. (2d) 820; Perkins v. Commonwealth, 227 Ky. 129, 12 S. W. (2d) 297; Mattingly v. Commonwealth, 240 Ky. 625, 42 S. W. (2d) 874."

It is therefore our conclusion that this award made appellee of compensatory damages by the jury is not to be disturbed, even though liberal in its amount, where it has been by the jury determined upon the evidence as representing in its judgment and discretion such amount as fairly compensates plaintiff for the suffering and pain experienced by her from her accident, expenses incurred in her treatment, future suffering reasonably to be anticipated and the handicap of being permanently crippled, under which she was left to earn her living as a domestic.

It is our conclusion, after a careful consideration of the whole record, the pleadings, proof and instructions of the court, that we are not authorized to reverse the judgment and grant appellant a new trial.

Judgment affirmed.